**UNITED STATES ex rel. DE GEORGE
v. JORDAN, District Director.**

No. 10016.

United States Court of Appeals
Seventh Circuit.

July 10, 1950.

Thomas F. Dolan, Chicago, Ill., Sherlock J. Hartnett, Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., Benjamin D. Caruso, Asst. U. S. Dist. Atty., Chicago, Ill., John Peter Lulinski, Asst. U. S. Atty., Dewey G. Hutchinson, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This appeal is from an order of the District Court dismissing the application of Sam De George, relator, for a writ of *habeas corpus*.

The appellant, Sam De George, in 1921, when he was 17 years of age, entered this country from Italy. In 1928 he married an American citizen, and to this marriage two children were born. One died and the other, now 18 years of age, is a student in an American university. The relator has resided in Harvey, Illinois, for many years and has no police record in that town. A real estate man of Harvey, Illinois, wrote a letter for relator to use in his deportation hearing in which he said that he had known the relator for twenty years, during which time the relator had always been a good citizen "with the exception that during the prohibition days he became mixed up with bad company and violated the liquor laws."

In 1938 on his plea of guilty the relator was sentenced for a period of 1 year and 1 day on a charge of violating § 88 of Title 18 U.S.C., 18 U.S.C.A. § 88 [now § 371]. The indictment charged a conspiracy to violate § 3321 of Title 26 U.S.C., 26 U.S.C.A. § 3321, in that the relator conspired to

remove and conceal distilled spirits with intent to defraud the United States of tax thereon. On this first sentence he served 9 months and 18 days in the penitentiary at Atlanta, Georgia. The appellant was again convicted of the same offense in 1941, and was then sentenced for a period of two years to the federal prison at Fort Leavenworth, Kansas, where he served 19 months and 18 days. It is significant to note that in his description of these two convictions the relator described them to the presiding inspector conducting the hearing for deportation as being convictions for conspiracy to violate the liquor laws.

Proceedings for his deportation were commenced in 1941, when the relator was a prisoner in the penitentiary at Fort Leavenworth. The final hearing on this proceeding was held in Chicago September 14, 1943, and the warrant for his arrest and deportation was issued January 11, 1946, pursuant to the provisions of the Immigration Act of 1917, 8 U.S.C.A. § 155(a). This section provides for the deportation of any alien who, subsequent to May 1, 1947, is sentenced more than once to imprisonment for one year or more because of conviction in this country of any crime *involving moral turpitude,* committed at any time after his entry.

By his petition for a writ of *habeas corpus* the relator sought to be discharged from the custody of the District Director of the United States Immigration and Naturalization Service under the writ of deportation, on the ground that the crimes for which he was sentenced did not involve moral turpitude. This contention presents the only question involved in this appeal.

When Congress enacted this statute providing for deportation of aliens it is clear that the intent was not to provide that all aliens who were twice sentenced for more than one year for crime were to be deported. It was necessary that such sentences be for crimes involving moral turpitude. The only possible purpose Congress could have had in inserting the provision "involving moral turpitude" in this statute was to classify or describe those crimes the commission of which by an alien, if resulting in convictions and sentences, would furnish grounds for deportation.

We find many definitions of moral turpitude. Webster's New International Dictionary, Second Edition, defines turpitude as meaning: "Foul, base. Inherent baseness or vileness of principle, words or actions; depravity." The same dictionary defines moral turpitude as being: "The quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory *mala prohibita.*" In 2 Bouvier's Law Dictionary, Rawle's Third Revision, p. 2247, moral turpitude is defined as, "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man." This Court in Ng Sui Wing v. United States, 7 Cir., 46 F.2d 755, at page 756, used this latter definition in defining the term. From all of these definitions we are given the same idea—that crimes described as involving moral turpitude are only those crimes which shock the public conscience, such as crimes of violence, or crimes revealing inherent baseness, vileness or depravity. We find evidence in the legislative history of the Act that Congress intended this provision of the Act to apply only to such infamous crimes. In the hearing before the committee of Immigration and Naturalization of the House, held on March 11, 1916, Congressman Sabath said he believed "in giving a man a chance who, due to conditions, commits some offense which really was not the crime of a hardened criminal." Police Commissioner Woods of New York City suggested to the committee, "I would make provision to get rid of an alien in this country who comes here and commits felonies and burglaries, holds you up on the streets, and commits crimes against our daughters, because we do not want that kind of alien here, and they have no right to be here."

In Volume II of Administrative Decisions under Immigration and Nationality Laws of the United States, p. 141, we find an administrative interpretation by the De-

partment then having the administration of the Act. In an opinion on a deportation proceeding decided by the Board June 26, 1944, and approved by the Attorney General July 12, 1944, the following statement from an opinion by the Solicitor of the Department of Labor was quoted with approval: "A crime involving moral turpitude may be either a felony or misdemeanor, existing at common law or created by statute, and is an act or omission which is *malum in se* and not merely *malum prohibitum;* which is actuated by malice or committed with knowledge and intention and not done innocently or with inadvertence or reflection; which is so far contrary to the moral law, as interpreted by the general moral sense of the community, that the offender is brought to public disgrace, is no longer generally respected, or is deprived of social recognition by good living persons; but which is not the outcome merely of natural passion, of animal spirits, of infirmity of temper, of weakness of character, of mistaken principles, *unaccompanied by a vicious motive or a corrupt mind.* (Italics supplied.)"

From the above definitions, legislative history and administrative interpretation, it seems perfectly obvious that Congress in describing crimes which would furnish a ground for the deportation of aliens had something more in mind than the mere violation of a statutory law. The limitation, "involving moral turpitude", must be taken as meaning that Congress intended to include in the classification only such infamous crimes as would grievously offend the moral code of mankind, such crimes as would have this effect even in the absence of any prohibitive statute.

As support for its contention that the crimes here in question involved moral turpitude, the government relies principally on three decisions: Guarneri v. Kessler, 5 Cir., 98 F.2d 580; U. S. ex rel. Berlandi v. Reimer, 2 Cir., 113 F.2d 429; and Maita v. Haff, 9 Cir., 116 F.2d 337.

In Guarneri v. Kessler, supra, the Court found that a conspiracy to smuggle alcohol, intended for beverage purposes, into the United States with intent to defraud the United States in violation of the Tariff Act of 1930, constituted a crime involving moral turpitude. The Court there defined moral turpitude very broadly as being, 98 F.2d at page 581, " 'Anything done contrary to justice, honesty, principle or good morals.' " That definition would cover the violation of any criminal statute. The Court there pointed out, however, that: "Smuggling is a crime at common law. Keck v. United States, 172 U.S. 434, 19 S.Ct. 254, 43 L.Ed. 505. Fraud is an ingredient of the offense and the statutes providing for its punishment are not merely prohibitory. We have no hesitancy in holding that to clandestinely introduce goods into the United States with intent to defraud the revenue is dishonest and fraudulent and involves moral turpitude."

In pointing out that smuggling was a crime at common law the Court was apparently bolstering its holding that the crime there being considered involved moral turpitude. We think the common concept of those who engage in smuggling as a business is that they are dangerous criminals, criminals who would use any force or violence necessary to meet the dangers with which the business of smuggling is fraught.

In U. S., ex rel. Berlandi v. Reimer, supra, the Court held that the same crime which we are considering in the instant case did involve moral turpitude. There also the relator conspired to violate the internal revenue laws by depositing and concealing distilled spirits with intent to defraud the United States of the taxes imposed thereon. The Court said, 113 F.2d at page 430: "We think it cannot be said that one who conducts a business with intent to defraud the government of taxes * * * stands in a different position from that of a person who defrauds a private citizen of property. An intent to steal or defraud in the latter case has repeatedly been held to render an offense one which involves moral turpitude and for which an alien may be deported or excluded under the Immigration Laws."

The only other decision by a United States Court of Appeals holding that dealing with alcohol with intent to defraud the United States of the tax thereon constituted a crime involving moral turpitude is

Maita v. Haff, 9 Cir., 116 F.2d 337. In that decision the Court simply announced without discussion or the citation of authorities, 116 F.2d at page 337, "This crime involves moral turpitude."

We find ourselves unable to agree with the holding in these two decisions.

In the case at bar the relator and others were twice apprehended operating an illicit still and distributing alcohol on which the tax had not been paid. In the Berlandi case the Court pointed out that before the repeal of the 18th Amendment prosecutions under the internal revenue statutes "were but alternatives for prosecutions under the Volstead Act," and convictions under the various statutes might have been treated alike so far as any question of moral turpitude was concerned. By that language the Court conceded that while prohibition was in' effect a defendant on the same set of facts could have been either prosecuted under the Volstead Act or under the internal revenue laws, and that the violation of either law would have been held to involve moral turpitude. The Court supported its holding in the Berlandi case that after repeal, a violation of the internal revenue laws by evading payment of the excise tax on liquor involved moral turpitude by arguing that prior to repeal the manufacture and sale of liquor was unlawful; that paying tax thereon would not make it lawful; and that therefore there would be no specific intent to defraud the government, "but only a general purpose to disregard the prohibition laws." But, the Court said, 113 F.2d at page 430, "Since the repeal, however, the situation would seem to be different for the business can now be lawfully conducted by the payment of internal revenue taxes and the specific intent becomes one of enhancing profits by evading taxes, rather than of satisfying the demand for liquor which the Prohibition Act refused to sanction." In other words, the Court would have us determine that there was or was not moral turpitude involved in a certain crime depending only upon the purpose which the perpetrator of the crime had in mind at the time the crime was committed. This would seem to be an untenable position.

The relator here would have been found guilty of the two crimes for which he was convicted and sentenced on proof of his having with others manufactured and sold the liquor without the payment of tax, whatever his specific purpose might have been. He would still have been found guilty if he had never heard of the requirement of payment of tax on the liquor involved. It is evident from his testimony before the Immigration Inspector that the relator thought he had been convicted of conspiracy to violate the liquor laws, not the internal revenue laws. The record indicates that he had been guilty of violating the liquor laws during prohibition. The courts almost uniformly held that such violations did not involve moral turpitude. Bartos v. U. S. District Court, 8 Cir., 19 F. 722; Coykendall v. Skrmetta, 5 Cir., 22 F.2d 120; U. S. ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920.

Judge Maris of the United States Court of Appeals for the Third Circuit, in U. S. ex rel. Manzella v. Zimmerman', D.C.E.D. Pa., 71 Supp. 534, 537, held that breaking prison and escaping did not involve moral turpitude within the meaning of the Immigration Act. The indictment there alleged that the alien "did break prison and escaped 'with force and arms.'" The Court pointed out, however, that in·determining whether a certain crime involves moral turpitude we must consider "the inherent nature of the crime under any and all circumstances," and that "the proper test is to consider whether a prison breach accomplished by the least imaginable force * * * for example, by prying open the bars of a window or forcing the lock of a door", would constitute a crime involving moral turpitude. The Court concluded that in view of the fact that the crime of prison breach could be committed under such circumstances, "I cannot say that the action of an escaping prisoner involves that element of baseness, vileness or depravity which has been * * * necessarily in-

herent in the concept of moral turpitude." If we apply this reasoning to the ground on which the Court based its opinion in the Berlandi case, it would seem that the crime there under consideration should not have been held to have involved moral turpitude.

But, if we adopt the reasoning of the Court in the Berlandi case and say that the purpose and specific intent of the relator there, after the repeal of Prohibition, was necessarily to evade taxes, rather than to satisfy the demand for liquor, we still are of the opinion that the crime should not be held to involve moral turpitude within the meaning of § 155 of the Immigration Act. We agree with the thought expressed in the dissenting opinion of Judge Learned Hand in the Berlandi case, 113 F.2d 429, 431, that the evasion of taxes should be commonly thought to be more morally shameful than it is but that many, many people who in private affairs are altogether right-minded seem to see nothing serious in evading taxes and this seems particularly true of excise taxes on liquor. Judge Hand also said in that dissent: " * * * and surely it is quite beyond measure to compare its disrepute with defrauding an individual. There is always the danger in construing this statute that we shall substitute logic for fact and deport a man for what people ought consistently to think of him, rather than for what they do; moreover, it is always embarrassing to appear to condone any deliberate violation of law. But, as we said in United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920, we must try to appraise the moral repugnance of the ordinary man towards the conduct in question; not what an ideal citizen would feel. That decision, in my opinion, rules this situation and the order should be reversed."

In United States v. Carrollo, D.C.W.D. Mo., 30 F.Supp. 3, 7, the Court in discussing the proper interpretation of moral turpitude in a deportation case said: "We are not prepared to rule that an attempt to evade the payment of a tax due the nation, or the commonwealth, or the city, or the school district, wrong as it is, unlawful as it is, immoral as it is, is an act evidencing baseness, vileness, or depravity of moral character. The number of men who have at some time sought to evade the payment of a tax or some part of a tax to some taxing authority is legion. Any man who does that should be punished civilly or by criminal sentence, but to say that he is base or vile or depraved is to misuse words." While this statement on evasion of tax was not necessary to that decision, we consider it a correct statement.

█ A statute authorizing deportation should be most strictly construed. In Fong Haw Tan v. Phelan, 333 U.S. 6, page 10, 68 S.Ct. 374, 376, 92 L.Ed. 433, the Supreme Court in construing another portion of the same section of the Act with which we are here concerned said:

"We resolve the doubts in favor of that construction (a liberal construction) because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

If we follow this rule of construction we must hold that crimes involving moral turpitude, as those words are used in § 155 of the Immigration Act, were intended to include only crimes of violence, or crimes which are commonly thought of as involving baseness, vileness or depravity. Such a classification does not include the crime of evading the payment of tax on liquor, nor of conspiring to evade that tax.

The judgment of the District Court is reversed and the cause remanded with instructions to enter an order discharging the relator.