JORDAN, DISTRICT DIRECTOR OF IMMIGRA-
TION & NATURALIZATION, *v.* DE GEORGE.

No. 348. Argued March 5, 1951.—Decided May 7, 1951.

*John F. Davis* argued the cause for petitioner. With
him on the brief were *Solicitor General Perlman, Assistant
Attorney General McInerney, L. Paul Winings* and
*Charles Gordon.*

*Thomas F. Dolan* argued the cause for respondent.
With him on the brief was *Sherlock J. Hartnett.*

MR. CHIEF JUSTICE VINSON delivered the opinion of
the Court.

This case presents only one question: whether con-
spiracy to defraud the United States of taxes on distilled

spirits is a "crime involving moral turpitude" within the meaning of § 19 (a) of the Immigration Act of 1917.[1]

Respondent, a native and citizen of Italy, has lived continuously in the United States since he entered this country in 1921.[2] In 1937, respondent was indicted under 18 U. S. C. § 88 [3] for conspiring with seven other defendants to violate twelve sections of the Internal Revenue Code. The indictment specifically charged him with possessing whiskey and alcohol "with intent to sell it in fraud of law and evade the tax thereon." He was further accused of removing and concealing liquor "with intent to defraud the United States of the tax thereon." [4] After pleading guilty, respondent was sentenced to imprisonment in a federal penitentiary for a term of one year and one day.

Respondent served his sentence under this conviction, and was released from custody. Less than a year later, he returned to his former activities and in December 1939, he was indicted again with eight other defendants for violating the same federal statutes. He was charged with conspiring to "unlawfully, knowingly, and willfully

---

[1] 39 Stat. 889, as amended, 8 U. S. C. § 155 (a).

[2] Less than three years after entering the United States, respondent was convicted for transporting liquor and sentenced to a term in the reformatory. In 1931, he was convicted and fined for transferring license plates.

[3] 35 Stat. 1096, now 18 U. S. C. § 371:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

[4] These charges were based upon 26 U. S. C. (1934 ed.) §§ 1155 (f), 1440 and 1441.

defraud the United States of tax on distilled spirits."[5] After being tried and found guilty in 1941, he was sentenced to imprisonment for two years.

While serving his sentence under this second conviction, deportation proceedings were commenced against the respondent under § 19 (a) of the Immigration Act which provides:

> ". . . any alien . . . who is hereafter sentenced more than once to such a term of imprisonment [one year or more] because of conviction in this country of any crime involving moral turpitude, committed at any time after entry . . . shall, upon the warrant of the Attorney General, be taken into custody and deported. . . ."[6]

After continued hearings and consideration of the case by the Commissioner of Immigration and Naturalization and by the Board of Immigration Appeals, respondent was ordered to be deported in January 1946, on the ground that he had twice been convicted and sentenced to terms of one year or more of crimes involving moral turpitude.[7] Deportation was deferred from time to time

---

[5] The record establishes that respondent was a large-scale violator engaged in a sizable business. The second indictment alone charged him with possessing 4,675 gallons of alcohol and an undetermined quantity of distilled spirits. At the rate of $2.25 a gallon then in effect, the tax on the alcohol alone would have been over $10,000.

[6] 39 Stat. 889, as amended, 8 U. S. C. § 155 (a).

[7] Section 19 (a) further provides: ". . . The provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, due notice having first been given to representatives of the State, make a recommendation to the Attorney General that such alien shall not be deported in pursuance of this chapter . . . ." 39

at respondent's request until 1949, when the District Director of Immigration and Naturalization moved to execute the warrant of deportation.

Respondent then sought habeas corpus in the District Court, claiming that the deportation order was invalid because the crimes of which he had been convicted did not involve moral turpitude. The District Court held a hearing, and dismissed the petition. The Court of Appeals reversed the order of the District Court and ordered that the respondent be discharged. 183 F. 2d 768 (1950). The Court of Appeals stated that "crimes involving moral turpitude," as those words were used in the Immigration Act, "were intended to include only crimes of violence, or crimes which are commonly thought of as involving baseness, vileness or depravity. Such a classification does not include the crime of evading the payment of tax on liquor, nor of conspiring to evade that tax." 183 F. 2d at 772. We granted certiorari to review the decision, 340 U. S. 890 (1950), as conflicting with decisions of the courts of appeals in other circuits.

This Court has interpreted the provision of the statute before us "to authorize deportation only where an alien having committed a crime involving moral turpitude and having been convicted and sentenced, once again commits a crime of that nature and is convicted and sentenced for it." *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 9–10 (1948). Respondent has on two separate occasions been convicted of the same crime, conspiracy to defraud the United States of taxes on distilled spirits. Therefore, our inquiry in this case is narrowed to determining whether this particular offense involves moral turpitude. Whether

---

Stat. 889, as amended, 8 U. S. C. § 155 (a). The record does not indicate that respondent has been pardoned, nor that the sentencing judge recommended that he not be deported, nor that respondent requested that such recommendation be made.

or not certain other offenses involve moral turpitude is irrelevant and beside the point.

The term "moral turpitude" has deep roots in the law. The presence of moral turpitude has been used as a test in a variety of situations, including legislation governing the disbarment of attorneys [8] and the revocation of medical licenses.[9] Moral turpitude also has found judicial employment as a criterion in disqualifying and impeaching witnesses,[10] in determining the measure of contribution between joint tort-feasors,[11] and in deciding whether certain language is slanderous.[12]

In deciding the case before the Court, we look to the manner in which the term "moral turpitude" has been applied by judicial decision. Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude. In the construction of the specific section of the Statute before us, a court of appeals has stated that fraud has ordinarily been the test to determine whether crimes not of the gravest character involve moral turpitude. *United States ex rel. Berlandi* v. *Reimer,* 113 F. 2d 429 (1940).

In every deportation case where fraud has been proved, federal courts have held that the crime in issue involved moral turpitude. This has been true in a variety of situ-

---

[8] *In re Kirby,* 10 S. D. 322, 73 N. W. 92, 39 L. R. A. 856 (1897). *Bartos* v. *United States District Court,* 19 F. 2d 722 (1927); see Bradway, Moral Turpitude as the Criterion of Offenses that Justify Disbarment, 24 Cal. L. Rev. 9–27.

[9] *Fort* v. *Brinkley,* 87 Ark. 400, 404, 112 S. W. 1084, 1085 (1908). "It seems clearly deducible from the above cited authorities that the words 'moral turpitude' had a positive and fixed meaning at common law . . . ."

[10] 3 Wigmore, Evidence (3d ed.), 540; cases are collected at 40 A. L. R. 1049, and 71 A. L. R. 219.

[11] *Fidelity & Cas. Co.* v. *Christenson,* 183 Minn. 182, 236 N. W. 618 (1931).

[12] *Baxter* v. *Mohr,* 37 Misc. 833, 76 N. Y. S. 982 (1902).

ations involving fraudulent conduct: obtaining goods under fraudulent pretenses, *Bermann* v. *Reimer,* 123 F. 2d 331 (1941); conspiracy to defraud by deceit and falsehood, *Mercer* v. *Lence,* 96 F. 2d 122 (1938); forgery with intent to defraud, *United States ex rel. Popoff* v. *Reimer,* 79 F. 2d 513 (1935); using the mails to defraud, *Ponzi* v. *Ward,* 7 F. Supp. 736 (1934); execution of chattel mortgage with intent to defraud, *United States ex rel. Millard* v. *Tuttle,* 46 F. 2d 342 (1930); concealing assets in bankruptcy, *United States ex rel. Medich* v. *Burmaster,* 24 F. 2d 57 (1928); issuing checks with intent to defraud, *United States ex rel. Portada v. Day,* 16 F. 2d 328 (1926). In the state courts, crimes involving fraud have universally been held to involve moral turpitude.[13]

Moreover, there have been two other decisions by courts of appeals prior to the decision now under review on the question of whether the particular offense before us in this case involves moral turpitude within the meaning of § 19 (a) of the Immigration Act. In *United States ex rel. Berlandi* v. *Reimer,* 113 F. 2d 429 (1940), and *Maita* v. *Haff,* 116 F. 2d 337 (1940), courts of appeals specifically decided that the crime of conspiracy to violate the internal revenue laws by possessing and concealing distilled spirits with intent to defraud the United States of taxes involves moral turpitude. Furthermore, in *Guarneri* v. *Kessler,* 98

---

[13] State decisions have held that the following crimes involve moral turpitude: passing a check with intent to defraud, *Bancroft* v. *Board of Governors of Registered Dentists of Oklahoma,* 202 Okla. 108, 210 P. 2d 666 (1949); using the mails to defraud, *Neibling* v. *Terry,* 352 Mo. 396, 177 S. W. 2d 502 (1944), *In re Comyns,* 132 Wash. 391, 232 P. 269 (1925); obtaining money and property by false and fraudulent pretenses, *In re Needham,* 364 Ill. 65, 4 N. E. 2d 19 (1936); possessing counterfeit money with intent to defraud, *Fort* v. *Brinkley,* 87 Ark. 400, 112 S. W. 1084 (1908). One state court has specifically held that the wilful evasion of federal income taxes constitutes moral turpitude. *Louisiana State Bar Assn.* v. *Steiner,* 204 La. 1073, 16 So. 2d 843 (1944).

F. 2d 580 (1938), a court of appeals held that the crime of smuggling alcohol into the United States with intent to defraud the United States involves moral turpitude.

In view of these decisions, it can be concluded that fraud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude. It is therefore clear, under an unbroken course of judicial decisions, that the crime of conspiring to defraud the United States is a "crime involving moral turpitude."

But it has been suggested that the phrase "crime involving moral turpitude" lacks sufficiently definite standards to justify this deportation proceeding and that the statute before us is therefore unconstitutional for vagueness. Under this view, no crime, however grave, could be regarded as falling within the meaning of the term "moral turpitude." The question of vagueness was not raised by the parties nor argued before this Court.

It is significant that the phrase has been part of the immigration laws for more than sixty years.[14] As dis-

---

[14] The term "moral turpitude" first appeared in the Act of March 3, 1891, 26 Stat. 1084, which directed the exclusion of "persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude." Similar language was reenacted in the Statutes of 1903 and 1907. § 2, Act of March 3, 1903, 32 Stat. 1213; § 2, Act of Feb. 20, 1907, 34 Stat. 898. It has been suggested that the fact that this phrase has been used in the Immigration Laws for over sixty years has no weight in upholding its constitutionality. Of course, the mere existence of a statute for over sixty years does not provide immunity from constitutional attack. We have recently held an equally ancient statute unconstitutional for vagueness. *Winters* v. *New York*, 333 U. S. 507 (1948). There, a statute, which employed vague terminology wholly lacking in common law background or interpretation, was aimed at limiting rights of free speech. Even in the *Winters* case, however, several dissenting members of this Court were of the view that the venerability of the statute was an element to be considered in deciding the question of vagueness.

cussed above, the phrase "crime involving moral turpitude" has also been used for many years as a criterion in a variety of other statutes. No case has been decided holding that the phrase is vague, nor are we able to find any trace of judicial expression which hints that the phrase is so meaningless as to be a deprivation of due process.

Furthermore, this Court has itself construed the phrase "crime involving moral turpitude." In *United States ex rel. Volpe* v. *Smith, Director of Immigration,* 289 U. S. 422 (1933), the Court interpreted the same section of the Immigration Statute now before us. There, an alien had been convicted of counterfeiting government obligations with intent to defraud, and one question of the case was whether the crime of counterfeiting involved moral turpitude. This question was raised by the parties and discussed in the briefs. The Court treated the question without hesitation, stating that the crime of counterfeiting obligations of the United States was *"plainly a crime involving moral turpitude."* 289 U. S. at 423. (Emphasis supplied.)

The essential purpose of the "void for vagueness" doctrine is to warn individuals of the criminal consequences of their conduct. *Williams* v. *United States,* 341 U. S. 97, decided April 23, 1951; *Screws* v. *United States,* 325 U. S. 91, 103–104 (1945). This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law. *Lanzetta* v. *New Jersey,* 306 U. S. 451 (1939); *United States* v. *Cohen Grocery Co.,* 255 U. S. 81 (1921). It should be emphasized that this statute does not declare certain conduct to be criminal. Its function is to apprise aliens of the consequences which follow after conviction and sentence of the requisite two crimes.

Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case. We do this in view of the grave nature of deportation. The Court has stated that "deportation is a drastic measure and at times the equivalent of banishment or exile . . . . It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty." *Fong Haw Tan* v. *Phelan, supra,* at 10. We shall, therefore, test this statute under the established criteria of the "void for vagueness" doctrine.

We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. *United States* v. *Wurzbach,* 280 U. S. 396, 399 (1930). Impossible standards of specificity are not required.[15] *United States* v. *Petrillo,* 332 U. S. 1 (1947). The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured

---

[15] The phrase "crime involving moral turpitude" presents no greater uncertainty or difficulty than language found in many other statutes repeatedly sanctioned by the Court. The Sherman Act provides the most obvious example, "restraint of trade" as construed to mean "unreasonable or undue restraint of trade," *Nash* v. *United States,* 229 U. S. 373 (1913). Compare other statutory language which has survived attack under the vagueness doctrine in this Court: "in excess of the number of employees needed by such licensee to perform actual services," *United States* v. *Petrillo,* 332 U. S. 1 (1947); "any offensive, derisive or annoying word," *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942); "connected with or related to the national defense," *Gorin* v. *United States,* 312 U. S. 19 (1941); "psychopathic personality," *Minnesota* v. *Probate Court,* 309 U. S. 270 (1940); "wilfully overvalues any security," *Kay* v. *United States,* 303 U. S. 1 (1938); "fair and open competition," *Old Dearborn Co.* v. *Seagram Corp.,* 299 U. S. 183 (1936); "reasonable variations shall be permitted," *United States* v. *Shreveport Grain & Elevator Co.,* 287 U. S. 77 (1932); "unreasonable waste of natural gas," *Bandini Petro-*

by common understanding and practices. *Connally* v. *General Construction Co.,* 269 U. S. 385 (1926).

We conclude that this test has been satisfied here. Whatever else the phrase "crime involving moral turpitude" may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude. We have recently stated that doubt as to the adequacy of a standard in less obvious cases does not render that standard unconstitutional for vagueness. See *Williams* v. *United States, supra.* But there is no such doubt present in this case. Fraud is the touchstone by which this case should be judged. The phrase "crime involving moral turpitude" has without exception been construed to embrace fraudulent conduct. We therefore decide that Congress sufficiently forewarned respondent that the statutory consequence of twice conspiring to defraud the United States is deportation.

*Reversed.*

MR. JUSTICE JACKSON, dissenting.

Respondent, because he is an alien, and because he has been twice convicted of crimes the Court holds involve "moral turpitude," is punished with a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts. MR. JUSTICE BLACK, MR. JUSTICE FRANKFURTER and I cannot agree, because we believe the phrase "crime involving moral turpitude," as found in the Immigration Act,[1] has no sufficiently definite meaning to be a constitutional standard for deportation.

---

*leum Co.* v. *Superior Court,* 284 U. S. 8 (1931); "political purposes," *United States* v. *Wurzbach,* 280 U. S. 396 (1930); "range usually occupied by any cattle grower," *Omaechevarria* v. *Idaho,* 246 U. S. 343 (1918).

[1] Section 19 (a) of the Immigration Act of February 5, 1917, 39 Stat. 889, as amended, 8 U. S. C. § 155 (a).

Respondent migrated to this country from his native Italy in 1921 at the age of seventeen. Here he has lived twenty-nine years, is married to an American citizen, and his son, citizen by birth, is now a university student. In May, 1938, he pleaded guilty to a charge of conspiracy to violate the Internal Revenue Code [2] and was sentenced to imprisonment for one year and one day. On June 6, 1941, he was convicted of a second violation and sentenced to imprisonment for two years. During the decade since, he has not been arrested or charged with any law violation. While still in prison, however, deportation proceedings were instituted against him, resulting in 1946, in a warrant for arrest and deportation.

By habeas corpus proceedings, De George challenged the deportation order upon the ground that his is not a crime "involving moral turpitude." The District Court thought it did and dismissed the writ. The Court of Appeals for the Seventh Circuit thought it did not and reversed.[3] There is a conflict among the circuits.[4]

What the Government seeks, and what the Court cannot give, is a basic definition of "moral turpitude" to guide administrators and lower courts.

The uncertainties of this statute do not originate in contrariety of judicial opinion. Congress knowingly conceived it in confusion. During the hearings of the House Committee on Immigration, out of which eventually came the Act of 1917 in controversy, clear warning of its deficiencies was sounded and never denied.

"Mr. Sabath. . . . [Y]ou know that a crime involving moral turpitude has not been defined. No

---

[2] 53 Stat. 401, 26 U. S. C. § 3321.

[3] 183 F. 2d 768.

[4] *United States ex rel. Berlandi* v. *Reimer*, 113 F. 2d 429 (C. A. 2d Cir.) and *Maita* v. *Haff*, 116 F. 2d 337 (C. A. 9th Cir.) hold this crime involves moral turpitude. Cf. *Guarneri* v. *Kessler*, 98 F. 2d 580 (C. A. 5th Cir.), cert. denied, 305 U. S. 648.

one can really say what is meant by saying a crime involving moral turpitude. Under some circumstances, larceny is considered a crime involving moral turpitude—that is, stealing. We have laws in some States under which picking out a chunk of coal on a railroad track is considered larceny or stealing. In some States it is considered a felony. Some States hold that every felony is a crime involving moral turpitude. In some places the stealing of a watermelon or a chicken is larceny. In some States the amount is not stated. Of course, if the larceny is of an article, or a thing which is less than $20 in value, it is a misdemeanor in some States, but in other States there is no distinction." [5]

Despite this notice, Congress did not see fit to state what meaning it attributes to the phrase "crime involving moral turpitude." It is not one which has settled significance from being words of art in the profession. If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity [6] and moral turpitude seems to mean little more than morally immoral. [7] The Government confesses that

---

[5] Hearings before House Committee on Immigration and Naturalization on H. R. 10384, 64th Cong., 1st Sess. 8.

[6] Black's Law Dictionary defines turpitude as: "[I]nherent baseness or vileness of principle or action; shameful wickedness; depravity." An example of its use alone to signify immorality may be taken from Macaulay, whose most bitter critics would admit he was a master of the English word. "[T]he artists corrupted the spectators, and the spectators the artists, till the turpitude of the drama became such as must astonish all who are not aware that extreme relaxation is the natural effect of extreme restraint." History of England, Vol. I (1849 ed.), p. 374.

[7] Bouvier's Law Dictionary, Rawles Third Revision, defines "moral turpitude" as "An act of baseness, vileness or depravity in the private

it is "a term that is not clearly defined," and says: "The various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved."

Except for the Court's opinion, there appears to be universal recognition that we have here an undefined and undefinable standard. The parties agree that the phrase is ambiguous and have proposed a variety of tests to reduce the abstract provision of this statute to some concrete meaning.

It is proposed by respondent, with strong support in legislative history, that Congress had in mind only crimes of violence.[8] If the Court should adopt this construction, the statute becomes sufficiently definite, and, of course, would not reach the crimes of the respondent.

The Government suggests seriousness of the crime as a test and says the statute is one by which it is "sought to reach the *confirmed criminal,* whose criminality has been revealed in *two serious penal offenses."* (Italics supplied.) But we cannot, and the Court does not, take seri-

---

and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man."

[8] "Mr. Woods. . . . I would make provisions to get rid of an alien in this country who comes here and commits felonies and burglaries, holds you up on the streets, and commits crimes against our daughters, because we do not want that kind of alien here, and they have no right to be here. . . . The rule is that if we get a man in this country who has not become a citizen, who knocks down people in the street, who murders or who attempts to murder people, who burglarizes our houses with blackjack and revolver, who attacks our women in the city, those people should not be here . . . ." Hearings before House Committee on Immigration and Naturalization on H. R. 10384, 64th Cong., 1st Sess. 14. Mr. Woods was not an ordinary witness. As the then Police Commissioner of New York City, his testimony appears to have been most influential in this provision of the 1917 Act.

ousness as a test of turpitude. All offenses denounced by Congress, prosecuted by the Executive, and convicted by the courts, must be deemed in some degree "serious" or law enforcement would be a frivolous enterprise. However, use of qualifying words must mean that not all statutory offenses are subject to the taint of turpitude. The higher degrees of criminal gravity are commonly classified as felonies, the lower ones as misdemeanors. If the Act contemplated that repetition of any serious crime would be grounds for deportation, it would have been simple and intelligible to have mentioned felonies. But the language used indicates that there are felonies which are not included and perhaps that some misdemeanors are. We cannot see that seriousness affords any standard of guidance.

Respondent suggests here, and the Government has on other occasions taken the position, that the traditional distinction between crimes *mala prohibita* and those *mala in se* will afford a key for the inclusions and exclusions of this statute.[9] But we cannot overlook that what crimes

---

[9] In Volume II of Administrative Decisions under Immigration and Nationality Laws of the United States, p. 141, there is an administrative interpretation by the Department then having the administration of the Act. In an opinion on a deportation proceeding decided by the Board June 26, 1944, and approved by the Attorney General July 12, 1944, the statement was quoted with approval:

" 'A crime involving moral turpitude may be either a felony or misdemeanor, existing at common law or created by statute, and is an act or omission which is *malum in se* and not merely *malum prohibitum;* which is actuated by malice or committed with knowledge and intention and not done innocently or [without advertence] or reflection; which is so far contrary to the moral law, as interpreted by the general moral sense of the community, that the offender is brought to public disgrace, is no longer generally respected, or is deprived of social recognition by good living persons; but which is not the outcome merely of natural passion, of animal spirits, of infirmity of temper, of weakness of character, of mistaken principles, *unaccompanied by a vicious motive or a corrupt mind.'* [Italics supplied.]"

belong in which category has been the subject of controversy for years.[10]   This classification comes to us from common law, which in its early history freely blended religious conceptions of sin with legal conceptions of crime.   This statute seems to revert to that practice.

The Government, however, offers the *mala prohibita, mala in se* doctrine here in slightly different verbiage for determining the nature of these crimes.   It says: "Essentially, they must be measured against the moral standards that prevail in contemporary society to determine whether the violations are generally considered essentially immoral."

Can we accept "the moral standards that prevail in contemporary society" as a sufficiently definite standard for the purposes of the Act?   This is a large country and

---

[10] Crimes *mala in se*, according to Blackstone, are offenses against "[t]hose rights then which God and nature have established, and are therefore called natural rights, such as are life and liberty, . . . the worship of God, the maintenance of children, and the like." They are "crimes and misdemeanors, that are forbidden by the superior laws, and therefore styled *mala in se* (crimes in themselves), such as murder, theft, and perjury; which contract no additional turpitude from being declared unlawful by the inferior legislature."   According to Blackstone, crimes *mala prohibita* "enjoin only *positive duties,* and forbid only such things as are not *mala in se* . . . without any intermixture of moral guilt."   Illustrative of this type of crime are "exercising trades without serving an apprenticeship thereto, for not burying the dead in woollen, for not performing the statute-work on the public roads, and for innumerable other positive misdemeanors. Now these prohibitory laws do not make the transgression a moral offense, or sin: the only obligation in conscience is to submit to the penalty, if levied."   "[A]nd his conscience will be clear, which ever side of the alternative he thinks proper to embrace."   Cooley's Blackstone, Vol. I (4th ed.), pp. *54, *58.   Of this, J. W. C. Turner says: "Some of the weak points in this doctrine were detected by an early editor of Blackstone, and in modern times it is generally regarded as quite discredited."   The Modern Approach to Criminal Law 221. And cf. *United States* v. *Balint,* 258 U. S. 250.

acts that are regarded as criminal in some states are lawful in others. We suspect that moral standards which prevail as to possession or sale of liquor that has evaded tax may not be uniform in all parts of the country, nor in all levels of "contemporary society." How should we ascertain the moral sentiments of masses of persons on any better basis than a guess? [11]

The Court seems no more convinced than are we by the Government's attempts to reduce these nebulous abstractions to a concrete working rule, but to sustain this particular deportation it improvises another which fails to convince us. Its thesis is (1) that the statute is sixty years old, (2) that state courts have used the same concept for various purposes, and (3) that fraud imports turpitude into any offense.

1. It is something less than accurate to imply that in any sense relevant to this issue this phrase has been "part of the immigration laws for more than sixty years." [12]

But, in any event, venerability of a vague phrase may be an argument for its validity when the passing years

---

[11] As Judge Learned Hand put it, in attempting to resolve a similar conflict: "Even though we could take a poll, it would not be enough merely to count heads, without any appraisal of the voters. A majority of the votes of those in prisons and brothels, for instance, ought scarcely to outweigh the votes of accredited churchgoers. Nor can we see any reason to suppose that the opinion of clergymen would be a more reliable estimate than our own." *Schmidt* v. *United States*, 177 F. 2d 450, 451 (C. A. 2d Cir.).

[12] We are construing the Act of 1917 and not the earlier Immigration Acts, those of March 3, 1891, 26 Stat. 1084; March 3, 1903, 32 Stat. 1213; February 20, 1907, 34 Stat. 898. All of these prior statutes allowed deportation for conviction for *every felony* or crime, which meant for conviction of every crime involving a sentence of not less than a year. It then added another deportable category, to wit, misdemeanors involving moral turpitude. In addition to all crimes involving a sentence of a year or more, the earlier Acts carved out a small category of petty offenses, when they were of a kind

have by administration practice or judicial construction served to make it clear as a word of legal art. To be sure, the phrase in its present context has been on the statute books since 1917. It has never before been in issue before this Court. Reliance today on *United States v. Smith*, 289 U. S. 422, is unwarranted. There the Court assumed without analysis or discussion a proposition not seriously relied on. There have, however, been something like fifty cases in lower courts which applied this phrase. No one can read this body of opinions and feel that its application represents a satisfying, rational process. If any consistent pattern of application or consensus of meaning could be distilled from judicial decision, neither the Government nor the Court spells it out. Irrationality is inherent in the task of translating the religious and ethical connotations of the phrase into legal decisions. The lower court cases seem to rest, as we feel this Court's decision does, upon the moral reactions of particular judges to particular offenses. What is striking about the opinions in these "moral turpitude" cases is the wearisome repetition of clichés attempting to define "moral turpitude," usually a quotation from Bouvier. But the guiding line seems to have no relation to the result reached. The chief impression from the cases is the caprice of the judgments.[13] How many aliens have

"involving moral turpitude," *i. e.,* offenses even though carrying a small sentence having a manifestation of intrinsic badness. But that creates a very different problem from requiring us to discriminate among all offenses, felonies and misdemeanors on the basis of intrinsic badness.

[13] How unguiding the guide "moral turpitude" is, in relation to the enforcement of the Act of 1917, can be shown by three pairs of cases:

(1) In *Tillinghast v. Edmead*, 31 F. 2d 81, the First Circuit, over a pungent dissent, held that a conviction for petty larceny by an "ignorant colored girl" working as a domestic was an offense involving "moral turpitude." On the other hand, in *United States v. Uhl*,

been deported who would not have been had some other judge heard their cases, and vice versa, we may only guess. That is not government by law.

2. The use of the phrase by state courts for various civil proceedings affords no teaching for federal courts. The Federal Government has no common-law crimes and the judges are not permitted to define crimes by decision, for they rest solely in statute.[14]   Nor are we persuaded that the state courts have been able to divest the phrase of its inherent ambiguities and vagueness.

3. The Court concludes that fraud is "a contaminating component in any crime" and imports "moral turpitude." The fraud involved here is nonpayment of a tax.   The alien possessed and apparently trafficked in liquor without paying the Government its tax.   That, of course, is a fraud on the revenues.   But those who deplore

---

107 F. 2d 399, the Second Circuit held that conviction for possession of a jimmy, with intent to use it in the commission of some crime, the jimmy being "adapted, designed and commonly used for the commission of the crimes of burglary and larceny" was not for an offense involving "moral turpitude."

(2) In *United States* v. *Day,* 15 F. 2d 391 (D. C. S. D. N. Y.), Judge Knox held that an assault in the second degree, though by one intoxicated, constituted a crime involving "moral turpitude." But in *United States* v. *Zimmerman,* 71 F. Supp. 534 (D. C. E. D. Pa.), Judge Maris held that jail-breaking by a bank robber awaiting trial was not an offense involving "moral turpitude."

(3) In *Rousseau* v. *Weedin,* 284 F. 565, the Ninth Circuit held that one who was convicted of being a "jointist" under a Washington statute prohibiting "the unlawful sale of intoxicating liquor" was deportable as having committed a crime involving "moral turpitude." While in *Hampton* v. *Wong Ging,* 299 F. 289, it held (with the same two judges sitting in both cases) that a conviction under the Narcotic Act was not of itself a crime of "moral turpitude," since the record did not show whether the offense for which conviction was had was "of such an aggravated character as to involve moral turpitude."

[14] *Viereck* v. *United States,* 318 U. S. 236, 241.

the traffic regard it as much an exhibition of moral turpitude for the Government to share its revenues as for respondents to withhold them. Those others who enjoy the traffic are not notable for scruples as to whether liquor has a law-abiding pedigree. So far as this offense is concerned with whiskey, it is not particularly un-American, and we see no reason to strain to make the penalty for the same act so much more severe in the case of an alien "bootlegger" than it is in the case of a native "moonshiner." I have never discovered that disregard of the Nation's liquor taxes excluded a citizen from our best society and I see no reason why it should banish an alien from our worst.

But it is said he has cheated the revenues and the total is computed in high figures. If "moral turpitude" depends on the amount involved, respondent is probably entitled to a place in its higher brackets. Whether by popular test the magnitude of the fraud would be an extenuating or an aggravating circumstance, we do not know. We would suppose the basic morality of a fraud on the revenues would be the same for petty as for great cheats. But we are not aware of any keen sentiment of revulsion against one who is a little niggardly on a customs declaration or who evades a sales tax, a local cigarette tax, or fails to keep his account square with a parking meter. But perhaps what shocks is not the offense so much as a conviction.

We should not forget that criminality is one thing— a matter of law—and that morality, ethics and religious teachings are another. Their relations have puzzled the best of men. Assassination, for example, whose criminality no one doubts, has been the subject of serious debate as to its morality.[15]. This does not make crime less crim-

---

[15] John Stuart Mill, referring to the morality of assassination of political usurpers, passed by examination of the subject of Tyrannicide, as follows: "I shall content myself with saying that the subject

inal, but it shows on what treacherous grounds we tread when we undertake to translate ethical concepts into legal ones, case by case. We usually end up by condemning all that we personally disapprove and for no better reason than that we disapprove it. In fact, what better reason is there? Uniformity and equal protection of the law can come only from a statutory definition of fairly stable and confined bounds.

A different question might be before us had Congress indicated that the determination by the Board of Immigration Appeals that a crime involves "moral turpitude" should be given the weight usually attributed to administrative determinations. But that is not the case, nor have the courts so interpreted the statute. In the fifty-odd cases examined, no weight was attached to the decision of that question by the Board, the court in each case making its own independent analysis and conclusion. Apparently, Congress expected the courts to determine the various crimes includable in this vague phrase.[16] We think that not a judicial function.

---

has been at all times one of the open questions of morals; that the act of a private citizen in striking down a criminal, who, by raising himself above the law, has placed himself beyond the reach of legal punishment or control, has been accounted by whole nations, and by some of the best and wisest of men, not a crime, but an act of exalted virtue; and that, right or wrong, it is not of the nature of assassination, but of civil war." Mill, On Liberty and Considerations on Representative Government, p. 14, n. 1.

The vice of leaving statutes that inflict penalties so vague in definition that they throw the judge in each case back upon his own notions is the unconscious tendency to

> "Compound for Sins they are inclin'd to,
> By damning those they have no mind to."

Butler, Hudibras, Vol. I (1772 ed.), 28.

[16] However, a statement by the Chairman of the Committee on Immigration and Naturalization may suggest another explanation: "My recollection is that the Supreme Court of the United States has

A resident alien is entitled to due process of law.[17] We have said that deportation is equivalent to banishment or exile.[18] Deportation proceedings technically are not criminal; but practically they are for they extend the criminal process of sentencing to include on the same convictions an additional punishment of deportation. If respondent were a citizen, his aggregate sentences of three years and a day would have been served long since and his punishment ended. But because of his alienage, he is about to begin a life sentence of exile from what has become home, of separation from his established means of livelihood for himself and his family of American citizens. This is a savage penalty and we believe due process of law requires standards for imposing it as definite and certain as those for conviction of crime.

Strangely enough, the Court does not even pay the tribute of a citation to its recent decision in *Musser* v. *Utah*, 333 U. S. 95, where a majority joined in vacating and remanding a decision which had sustained convictions under a Utah statute which made criminal a conspiracy "to commit acts injurious to public morals." We said of that statute: "Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order." 333 U. S. at 97. For my part, I am unable to rationalize why "acts injurious to public morals" is vague if "moral turpitude" is not. And on remand, the Supreme Court of

---

determined what crimes are crimes involving moral turpitude under the Federal law, and if so, that would control, I should think." Hearings before House Committee on Immigration and Naturalization on H. R. 10384, 64th Cong., 1st Sess. 8.

[17] *Wong Yang Sung* v. *McGrath*, 339 U. S. 33.

[18] *Fong Haw Tan* v. *Phelan*, 333 U. S. 6, 10.

Utah said: "We are . . . unable to place a construction on these words which limits their meaning beyond their general meaning." *State* v. *Musser*, —— Utah ——, ——, 223 P. 2d 193, 194 (Oct. 20, 1950).

In *Winters* v. *New York*, 333 U. S. 507, the Court directly struck down for indefiniteness a statute sixty years on the statute books of New York and indirectly like statutes long on the books of half the States of the Union.[19] The New York statute made a person guilty of a misdemeanor who in any way distributes "any book, pamphlet, magazine, newspaper or other printed paper devoted to the publication, and principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime; . . . ." 333 U. S. at 508. That statute was certainly no more vague than the one before us now and had not caused even a fraction of the judicial conflict that "moral turpitude" has.

In *Winters* v. *New York, supra,* the Court rested heavily on *Connally* v. *General Construction Co.,* 269 U. S. 385, in which this Court found unconstitutional indefiniteness in a statute calling for "the current rate of per diem wages in the locality" where contractors were doing government work. (The sanction of the statute was a relatively small money fine, or a maximum of six months, though of course a corporate violator could only be subjected to the fine.) The test by which vagueness was to be determined according to the *Connally* case was that legislation uses terms "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." 269 U. S. at 391. It would seem to be difficult to find a more striking instance

---

[19] The Court's reference to the dissent in the *Winters* case would seem to make questionable its present force as an authority.

than we have here of such a phrase since it requires even judges to guess and permits them to differ.

We do not disagree with a policy of extreme reluctance to adjudge a congressional Act unconstitutional. But we do not here question the power of Congress to define deportable conduct. We only question the power of administrative officers and courts to decree deportation until Congress has given an intelligible definition of deportable conduct.