MATTER OF B—

In DEPORTATION Proceedings

A-5504324

*Decided by Board February 15, 1961*

Deportability—Section 241(a)(4), 1952 act—"Single scheme."

Where respondent, who was convicted in 1958 on two counts of having car-
ried on the business of a retail liquor dealer without having paid the fed-
eral occupational tax of $25 per year, contended that he was not deporta-
ble within section 241(a)(4) of the 1952 Act as his offenses under the fed-
eral law arose out of a single scheme of criminal misconduct (having failed
to pay the tax in two successive years of continuous operation of the same
business), it was found that "single scheme" not present where the record
showed that on October 14, 1951, the date of the commission of the first
offense in the federal indictment, respondent was convicted and sentenced
by local authorities for violation of the local liquor laws whereupon he
ceased the illegal sale of liquor in his restaurant on a trial basis and did
not resume this activity until after having formulated a new plan to vio-
late the liquor laws.

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable
—No visa.
Act of 1952—Section 241(a)(5) [8 U.S.C. 1251(a)(5)]—Failure to
to furnish address reports.
Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Conviction
for two crimes involving moral turpitude after entry.

BEFORE THE BOARD

DISCUSSION: On May 23, 1960, this Board dismissed the re-
spondent's appeal from the order of the special inquiry officer requir-
ing his deportation on the charges stated above. The respondent
sought judicial review of the Board's order. On November 3, 1960,
the United States District Court, District of Connecticut, entered
an order remanding the case to the Board to accord the respondent
"the privilege of being represented by counsel of his choosing
throughout proceedings on appeal before that Board" (*Barrese v.
Ryan*, 189 F. Supp. 449). The court did not go into the merits of
the charges.

On November 29, 1960, the Board notified counsel for the re-
spondent that the case had been calendared for oral argument.

211

Counsel did not appear for oral argument but submitted a written brief in support of the respondent's appeal. In this brief, issue is taken with each charge. The Service did not appear at oral argument and makes no representations.

The charge based on section 241(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1251(a)(4)) provides for the deportation of an alien "convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." The convictions may come from a single trial, and confinement is not necessary. Counsel argues that the crimes arose out of a single scheme and cannot be the basis for deportation.

The respondent last entered the United States in October 1955. On October 8, 1958, the respondent was convicted in the United States District Court at New Haven, Connecticut, on a plea of guilty, on two counts for violation of 26 U.S.C. 3253 (now 26 U.S.C. 5691, 7301(a)) for having carried on the business of a retail liquor dealer without having paid the necessary tax with intent to defraud the United States. Both violations arose out of the sale of liquor in the respondent's place of business in Bridgeport, Connecticut. The first count concerned a violation which occurred on or about the 14th day of October 1951, and the second count, one which occurred on or about the 6th day of April 1952. (A third count concerning a violation on or about April 11, 1952, was dismissed.)[1] Sentence on each count was to imprisonment for 15 months and a fine of $500; the sentences to imprisonment were to run consecutively and the fines were cumulative. Counsel contends that the two convictions arose out of a single scheme because the respondent was convicted for failing to pay a $25 federal occupational per annum tax in two successive years of continuous operation of the same business. In finding that the crimes had not arisen out of a single scheme of criminal misconduct, the Board cited *Matter of Z—*, 8—170, which was overruled in *Zito* v. *Moutal*, 174 F. Supp. 531 (N.D. Ill., 1959). However, we see no reason to change our conclusion that a single scheme does not exist here. The crimes before us were not the result of an overall plan but of two separate plans, and to find a single scheme the acts must be committed pursuant to an overall plan (*Chanan Din Khan* v. *Barber*, 147 F. Supp. 771 (N.D. Calif., 1957), aff'd 253 F.2d 547 (C.A. 9, 1958), cert. den. 357 U.S. 920; *Wood* v. *Hoy*, 266 F.2d 825 (C.A. 9, 1959)). In the instant case, the violations of law are not shown to have occurred under one overall plan; in fact, the record affirmatively establishes the contrary. The record contains the respondent's tes-

---

[1] The same unlawful sale of liquor had been the subject of punishment by local police authorities. The convictions on October 15, 1951, and April 6, 1952, had resulted in fines.

timony that after his conviction on October 14, 1951, by local authorities for violating the liquor laws, he had stopped selling liquor in the hope that he could make a living without engaging in such activity. It was only after a trial period during which he found that he could not get restaurant business without making liquor available to customers that he started again. It is clear then that the second violation of law occurred not under the first plan of illegal conduct, for that had terminated after the first arrest and conviction; the second violation occurred under a new plan to violate the law—a plan formulated after society had brought it home to him by an arrest, conviction, and fine, that his conduct was improper and would not be tolerated. A single scheme did not exist here (*Chanan Din Khan* v. *Barber, supra*).

The crimes in question involve an intent to defraud; this establishes that moral turpitude is involved (*United States ex rel. Carrollo* v. *Bode*, 204 F.2d 220 (C.A. 8, 1953), cert. den. 346 U.S. 857; *Jordan* v. *DeGeorge*, 341 U.S. 223).

We shall now deal with the documentary charge. The respondent last entered the United States on about October 6, 1955. We sustained the documentary charge. We held that the respondent needed a visa to enter and that he did not have one. Counsel contends that the respondent did not need a visa to enter the United States; that as a "returning resident" he needed only a border-crossing card; that he had such a card in his possession; and that the Government has not sustained its burden of establishing that the respondent had entered illegally.

A "returning resident" is entitled to enter the United States without a visa under certain circumstances (section 211(b), Immigration and Nationality Act, 8 U.S.C. 1181(b); 8 CFR 211.2(c)(1), 8 CFR 211.2(c)(2), 8 CFR 211.2(c)(6) (regulations in effect at time of last entry)). The respondent would have been entitled to reenter the United States as a "returning resident" (1) if he had been originally lawfully admitted for permanent residence, (2) if he had that status when he departed, (3) if he departed from the United States with the intention of returning, (4) if he had not abandoned this intention, and (5) if he returned from a temporary visit abroad (*United States ex rel. Alther* v. *McCandless*, 46 F.2d 288 (C.A. 3, 1931; *Sercerchi* v. *Ward*, 27 F. Supp. 437 (D.C. Mass., 1939)).

This record fails to satisfy the first requirement (that the alien have been lawfully admitted for permanent residence); however, since this aspect of the case was not made an issue and was not completely developed at the hearing, we cannot rest our decision on this fact. We shall assume for the purpose of this discussion that the respondent had been lawfully admitted at some time and would have been entitled to reenter the United States to resume his resi-

213

dence if at the time of last application he was, in fact, a "retu..ing resident." (The respondent made several visits to Canada and whether or not he reentered legally on these occasions we need not explore.) We shall concern ourselves with whether the respondent was returning from a temporary visit abroad. The test employed will be that put to use in *Alther, supra.*

"Without attempting a complete definition of 'a temporary visit,' we may say that we think the intention of the departing immigrant must be to return within a period relatively short, fixed by some earlier event." It will be noted that under this rule the animus revertendi must exist as a positive element. A mere absence of intention to remain abroad permanently will not preserve the alien's nonquota status. The burden of proof is still with the government and must be met by the production of substantial evidence, but if it appear that he left with no definite intention, either of staying permanently or of returning, merely planning to let future events determine his course, his stay would not be a temporary visit and the statute would automatically place him in the quota class. (pp. 290–291)

Using this test, we find that the record establishes that if the respondent left the United States with a definite intention of returning, it was abandoned.

We come now to the pertinent facts on this issue. The respondent has given conflicting testimony about his trip to Canada: part of the testimony is found in this deportation hearing, the rest in a Canadian deportation proceeding. In this proceeding, the respondent testified he had lived in the United States from about 1916; that following his last arrest for a liquor violation in Bridgeport, Connecticut (1952), he closed his place and after looking for a livelihood a few months moved to New York where he remained for a few months (or a year and one-half) looking for a business, but could find nothing; that he then went to Canada to visit a sister who had come from Italy; that he stayed no longer than 30 days in Canada, returning each time to stay with friends or at a hotel in Nevada; that in Canada he engaged in no work but helped his brother-in-law who ran a gambling club in Canada; that he received no regular salary and had no interest in the club, being supported by money his sister in Canada was keeping for him; that after entering Canada, he made several trips back to the United States presenting social security card and other papers to gain entry into the United States; that on one occasion (about September 1954 or 1955), he was told to get a border-crossing pass of a temporary nature good for three or six months; and that he used this to make two entries. The respondent testified he last entered the United States at Blaine, Washington, on about October 6, 1955, returning to resume his permanent residence. He testified that he did not have an immigrant visa when he entered but that he had a border-crossing card. (Counsel in his brief alleges that the card has been

214

located and is now in his possession.) Much of this testimony is in sharp conflict with other statements made by the respondent.

In the immigration proceeding in Canada on April 7, 1955 (Exh. 4), the respondent testified that he had come to the United States in 1914 or 1915 en route to Canada to which he had been admitted and where he had remained until about 1925, when he entered the United States with the intention of seeing what it was like. He testified that he did not know whether or not he had then entered the United States on an immigrant visa and that he did not know whether his entry had been a legal one; that he had remained in the United States until 1952, coming to Canada for visits of a week or two; that he had last entered Canada in November 1952 to see his sister; that he came for a visit of about a week or month; that when he entered Canada *it was with the intention of seeing what it was like; that if he liked it he would stay, and if he did not like it he would return;* and that when asked if he intended to return to the United States, he stated he "wouldn't know." He said that during his visits to Canada he was urged to stay and go into business there; that in December 1952 or January 1953, he bought an interest in the Lumberman's Social Club, a gambling establishment at Vancouver, B.C.; that he had invested about $6,000; and that he derived an income of about $40 a week from his work for the club. The respondent admitted that he had served 10 months of the prison term in Canada in 1923–1924. During the hearing, the respondent produced a Canadian unemployment insurance card issued at Vancouver on January 19, 1953. He testified that he had remained in Canada since his entry in 1952.

Also pertinent to the question of whether the respondent abandoned whatever status he may have had in the United States is the fact that a federal indictment had been handed down against him on September 4, 1952 (the respondent denied having any knowledge of this until after his return to the United States in 1955), the fact that the respondent was joined by his "wife" in Canada several months after he went there and she stayed with him except for the time she went to visit her people, and the fact that the respondent alleges that when he went to Canada he left some of his clothes in the United States and took some with him. He had no bank account in the United States.

The respondent is a person of poor credibility. He has given us conflicting versions of the same incidents. Under the circumstances, we do not find it improper to believe the version of his Canadian experiences given to the Canadian officials—a version given at a time contemporaneous with the events in question, one made under oath and while he was represented by attorney, and one subject to verification on the spot. The Canadian version reveals that he came

215

to Canada to see what it was like and with the intention of staying if he liked it; that he did not leave Canada after he entered in 1952; that he bought a business there and made his living in Canada, and as late as April 7, 1955, did not know whether he intended to return to the United States. (We note that he did not return to the United States until after the last extension (seven had been obtained) from the Canadian authorities had expired (Exh. 4, release on bond form).) This testimony is quite consistent with the facts that the respondent had been unable to find a livelihood in the United States after searching and that he was under indictment in the United States. This testimony establishes that the respondent cannot meet the test of "returning resident" found in *United States ex rel. Alther* v. *McCandless, supra.* At the best, he merely planned "to let future events determine his course." The respondent was not, therefore, returning from a temporary visit, and he was required to be in possession of an immigrant visa to reenter the United States (sections 211(a) and 212(a)(20), Immigration and Nationality Act; 8 U.S.C. 1181(a) and 1182(a)(20)). (We have not utilized statements by the respondent's sister (Exh. 5) (or others) which corroborate the respondent's testimony in the Canadian deportation hearing, although we believe it proper to utilize these affidavits.)

Counsel, in his brief, states that the hearsay evidence (by which we presume he means the statements obtained by Service investigators from the respondent's relatives and partners in Canada) were not made available to him when a copy of the record was requested. We find no error in this regard. 8 CFR 292.4(b) authorizes a review of the record and the loan of a copy of the *testimony.* There is no showing that copies of the exhibits were requested. If a proper request had been made, arrangements to this end could no doubt have been made. Moreover, the respondent was notified in the Board's letter of November 29, 1960, that he could review the record at its offices in Washington, D.C., and the letter of December 14, 1960, by the District Director informed counsel to the same effect. Finally, we have not used these exhibits to find the respondent deportable.

We come now to the final charge. On reexamination of this charge, we shall not sustain it. Section 241(a)(5) [8 U.S.C. 1251 (a)(5)] requires the deportation of an alien who has failed to furnish a current address (and certain other information) required by the Attorney General of aliens. On and after January 1951, this information must be furnished on the first day of January of each year or within 30 days thereof, or if the alien is temporarily absent from the United States during this period, within 10 days after his return. An alien who has failed to comply with the requirement is deportable unless he establishes to the satisfaction of the Attorney

General that the failure was "reasonably excusable or was not willful."

The respondent returned to the United States in October 1955. He was required to furnish the necessary information within ten days after entry, and during January 1957, and January 1958, he did not do so. The respondent was not questioned concerning the period shortly after his arrival. Concerning the failure to register annually, the respondent testified he did not think the reporting requirement applied to him because he had been in the United States since 1916. He stated that he knew he had to register as an alien in 1940 but he did not file the address report card after 1940 (from 1940 to 1950 report was required when a change of permanent residence was made (54 Stat. 675; 8 U.S.C. 456)). The Service produced an address card dated January 10, 1951, which the respondent admitted he signed and which contains information concerning him which he admitted was true. When asked if he had heard that aliens were required to report their address in January 1957, he stated he had not paid attention.

We believe that the respondent has established that his failure was not a willful one. The record establishes that he registered as an alien in 1940, as an enemy alien subsequently, and that he furnished an address card in January 1951. There is no evidence that he furnished such an address card in January 1952. In January 1952, there was no reason for him to conceal information as to his address. He was apparently living and doing business in the same places; he had not yet been arrested the second time (April 1952) and was not yet under indictment. His failure to furnish an address card in January 1952, under these circumstances, adds conviction to his claim that in 1957 and 1958 he either was unaware of the requirement or that it related to him.

Counsel alleges that the respondent is virtually illiterate in English. This allegation must be viewed in light of the fact that no interpreter was used during the deportation proceedings; that his answers were responsive and explanatory; that he was a businessman for many years; and that he was able to obtain the necessary social security card, alien registration card, and Canadian unemployment registration when it was to his advantage to do so.

We have made no use of exhibit 11 concerning which counsel complains. We see no error in its admission and note it is duplicated to a good extent by exhibits 12 and 13 which the respondent admitted related to him.

The appeal will be dismissed.

ORDER: It is ordered that the appeal be and the same is hereby dismissed but that deportation pursuant to law be ordered only on the first and third charges set forth in the order to show cause.