**UNITED STATES of America, Plaintiff,**

v.

**Thomas D. FARBER, John Doe #1, "Jim", Steven Isaac Fox, Thomas R. Gizzi, Rand J. Chortkoff, John Doe #2, "Jaffe", John Leahy, Bruce Abbott Fletcher, Charles Innes, John Doe #3, "John", and Sam Lee Mack, Defendants.**

**Crim. No. 42471.**

United States District Court
N. D. California.

Oct. 10, 1969.

Cecil F. Poole, U. S. Atty., David P. Bancroft, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Thomas J. Hannon, San Francisco, for defendant Gizzi.

Gordon D. Lapides, San Francisco, Cal., for defendant Chortkoff.

Leal Grupp, San Francisco, Cal., for defendant Leahy.

Joseph A. Filippelli, San Francisco, Cal., for defendant Innes.

William Osterhoudt, Cal., (Legal Aid Society), for defendant Fletcher.

MEMORANDUM    AND    ORDER

OLIVER J. CARTER, District Judge.

The Grand Jury for the Northern District of California returned an indict-

ment charging the defendants herein with conspiring to committ offenses against the United States in violation of 18 U.S.C. § 371. Specifically, the indictment charges the defendants with conspiring "to sell, deliver and dispose to another party and parties, a quantity of a depressant, stimulant, and hallucinogenic drug, lycergic acid diethylamide (commonly known as and referred to in this indictment as "LSD") all in violation of Title 21 United States Code, Sections 331(q) (2), 360a(b), and 321(v) (3)." The case has proceeded to trial before a jury. The government's evidence includes proof that the alleged conspiracy ultimately led to an offer by the defendant Farber to sell approximately 50,000 pills. The evidence shows that these pills are d-lysergic acid diethylamide in a salt form, not the free base form. The issue presented to the Court is whether or not the government must offer proof that the confiscated pills are lysergic acid diethylamide in the free base form in order to obtain a conviction of these defendants.

The substantive offenses with which the defendants are charged with conspiring to commit are herein set forth in pertinent part:

> 21 U.S.C. § 331: The following acts and the causing thereof are prohibited: * * *
>
> (q) * * * (2) the sale, delivery, or other disposition of a drug in violation of section 36a(b) of this title; * * *.
>
> 21 U.S.C. § 360a(b): No person, other than [persons exempt from prohibition] shall sell, deliver, or otherwise dispose of any depressant or stimulant drug to any other person.

> 21 U.S.C. § 321(v): The term "depressant or stimulant drug" means—
>
> (3) lysergic acid diethylamide and any other drug which contains any quantity of a substance which the Secretary [properly finds and designates].

■ Both the statute (21 U.S.C. § 321 (v) (3)) and the indictment in this case use the phrase "lysergic acid diethylamide" in designating the drug that is the subject matter of the offense involved. The defendants have moved the Court for a judgment of acquittal on the ground that the government's evidence fails to support a conviction of conspiring to dispose of lysergic acid diethylamide. More specifically, the defendants contend that the phrase "lysergic acid diethylamide" as used in the statute and in the indictment, does not include "lysergic acid diethylamide in the salt form." In addition, the defendants contend that even if the phrase "lysergic acid diethylamide" as used in the statute and in the indictment, is interpreted to include "lysergic acid diethylamide in the salt form," either or both of the statute and the indictment are fatally vague for indefiniteness and fail to give sufficient notice of the elements of the offense defined and of the offense charged. The Court concludes that a conviction of the defendants in this case of the commission of the charged conspiracy is sustainable as far as the issues discussed herein are involved.

The Court has given an instruction to the jury charging that the defendants should be found guilty if the jury finds beyond a reasonable doubt that the defendants conspired to dispose of d-lysergic acid diethylamide in the free base form [1] or in the salt form. The Court

---

1. The free base form of lysergic acid diethylamide can exist in four different forms, towit: 1) d-lysergic acid diethylamide, 2) l-lysergic acid diethylamide, 3) d-isolysergic acid diethylamide, and 4) l-iso-lysergic acid diethylamide. It will suffice to say that the difference between these four forms of lysergic acid diethylamide lies in the structural positions of the atoms which make up the lysergic acid diethylamide molecule, such that among other things, their reactions to polarized light may vary accordingly. The Court does not concern itself with

holds that this instruction is proper for the reasons set forth below.

## I. FEDERAL FOOD, DRUG, AND COSMETIC ACT

Prior to October 24, 1968, federal law prohibiting the disposition of the drug "LSD" was partly based on administrative regulation.[2] On that date, Congress amended the Federal Food, Drug, and Cosmetic Act by specifically including "lysergic acid diethylamide" in the definition of a "depressant or stimulant drug." Pub.L. No. 90–639 (Oct. 24, 1968). Congress also amended the Act by providing for an increase in penalties for unlawful acts involving this and other drugs. *Id.* The legislative history accompanying this enactment clearly indicates that Congress used the phrase "lysergic acid diethylamide" synonymously

the distinctions between these four forms except to the extent that the Court concludes that the phrase "lysergic acid diethylamide" as used in the statute and in this indictment clearly means "d-lysergic acid diethylamide." The Court has instructed the jury that a finding of a conspiracy to dispose of d-lysergic acid diethylamide (in the base or salt forms) is necessary for conviction. Thus the Court's use herein of the phrase "lysergic acid diethylamide" is restricted to mean "d-lysergic acid diethylamide."

The Court's memorandum is directed toward the dispute concerning the distinction between the salt and the free base forms of lysergic acid diethylamide, in accordance with the arguments which have been presented to the Court and the

evidence that exists in this case. The government does not contend that it need not prove a conspiracy to dispose of d-lysergic acid diethylamide, so this Court need not decide whether or not Congress has included the di-iso, l, or l-iso forms of lysergic acid diethylamide, by designating the prohibited drug as "lysergic acid diethylamide."

As to any argument which may arise concerning the sufficiency of the indictment which is phrased in terms of "lysergic acid diethylamide," the Court summarily concludes that the indictment sufficiently charges "d-lysergic acid diethylamide" upon reasoning similar to that in the Court's discussion which follows concerning the indictment's requirement of specificity.

2. 21 U.S.C. § 331 Prohibited Acts
The following acts and the causing thereof are prohibited;
(q) * * * (2) the sale, delivery, or other disposition of a drug in violation of section 360a(b) of this title; * * *.

21 U.S.C. § 360a(b)
No person other than [stated exceptions] shall sell, deliver, or otherwise dispose of any depressant or stimulant drug to any other person.

21 U.S.C. § 321 Definitions; generally for the purposes of this chapter * * *
(v) The term "depressant or stimulant drug" means * * * (3) any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect; * * *.

21 C.F.R. § 166.3 Listing drugs defined in section 201(v) [21 U.S.C. § 321] of the act * * *
(c) The Commissioner has investigated and designates all drugs * * * containing any amount of the following substances as having a potential for abuse because of their * * *
(3) Hallucinogenic effect * * *.

| Established name | Some trade and other names |
|---|---|
| LSD–25; LSD | |

with the term "LSD."[3] It also establishes that Congress intended by use of the phrase "lysergic acid diethylamide", to curb use by many of the young people across the nation of a drug known to them as "LSD." Throughout the legislative history of the amending bill there is repeated use of the term "LSD" in context which convinces this Court that the term "LSD" was used by the Congressmen as it is understood by them and by the public. This understanding is due to the widespread use of the term by the mass media and by members of the public itself who have had occasion to use or hear the term on the streets. As so used and heard, the term "LSD" means any form of a drug which chemically contains the substance lysergic acid diethylamide and which has the hallucinogenic potential of that substance.

Therefore, the Court concludes that the term "LSD" as found in the legislative history means a drug which contains the chemical substance known as lysergic acid diethylamide, a derivative of lysergic acid. In turn, Congress' use of the phrase "lysergic acid diethylamide" in the statute is intended to mean and does in fact mean a drug in any chemical form which contains that substance and does not significantly distort the characteristics of lysergic acid diethylamide in its free base chemical state.

## II. LSD–25 from SANDOZ PHARMACEUTICALS

In support of their contention that Congress did not intend to include the salt form of lysergic acid diethylamide when it designated the prohibited drug as "lysergic acid diethylamide," the defendants have made an attempt to prove that use of the term "LSD" in the legislative history of the 1968 amendment was restricted to lysergic acid diethylamide in the free base form. Evidence

has been introduced to show the source and history of the drug referred to as "LSD". That history is now briefly discussed.

Albert Hofmann is credited as the man chiefly responsible for the discovery of what is now known as "LSD". His discovery came while he was working as a chemist for Sandoz Pharmaceuticals, a commercial firm in Basel, Switzerland, in the 1930's. It was at this time that D–Lysergic Acid Diethylamide was discovered and given the designation "LSD–25" by Sandoz Pharmaceuticals. Since that time, Sandoz Pharmaceuticals has produced LSD–25 and has distributed the drug to a restricted number of recipients for the purpose of investigation. In the United States, distribution was made through the Hanover, New Jersey affiliate of Sandoz Pharmaceuticals. In 1966, Sandoz discontinued distribution in the United States of the product which is called "LSD–25".

Defendants have introduced evidence that Sandoz' drug, LSD–25 was and has been marketed in the free base form, thereby giving meaning to the term "LSD", (or "LSD–25"), as a drug only in the free base form. The government has introduced evidence that Sandoz' LSD–25 has been marketed in the tartrate form.[4] The Court finds that LSD–25 as produced and marketed by Sandoz Pharmaceuticals included the tartrate form of lysergic acid diethylamide. The Court concludes that even if Sandoz Pharmaceuticals produced and distributed LSD–25 only in the free base form, the public has not attached a secondary meaning to the term "LSD" which is restricted to lysergic acid diethylamide in the free base form. To the contrary, the Court concludes that the term "LSD" which originated as a trade designation of a drug, has acquired a secondary meaning which is broader in scope than that urged by the defendants.

---

3. See Appendix "A"

4. "Lysergic acid diethylamide tartrate" is a salt form of "lysergic acid diethylamide." The lysergic acid diethylamide tartrate compound is formed by adding tartaric acid to the free base form of lysergic acid diethylamide in the free base form. See p. 53, *infra.*

Therefore, the evidence produced amply supports the Court's conclusion that the Congressional use of the phrase "lysergic acid diethylamide" synonymously with the term LSD, clearly expressed an intent to include lysergic acid diethylamide in both its free base and its salt forms.

## III. CLARITY AND DUE PROCESS

An interpretation that the statute and the indictment include disposition of lysergic acid diethylamide in the salt form, requires a determination of whether or not the statute and the indictment have sufficiently specified the nature of the criminal acts these defendants are charged with.

■■■ It is well-settled that a penal statute must fix an ascertainable standard of guilt, and must adequately inform the accused of the nature and cause of the charge against him. See United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964); United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921). It is also well-settled that an indictment must sufficiently apprise the accused of the charge against him so that he will be able to prepare his defense and avail himself of his double jeopardy right against further prosecution for the same cause. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932).

## A. CHEMICAL MAKE-UP AND CHARACTERISTICS

In determining whether the Court's interpretation of the statute and the indictment meet the requirement of clarity, it is necessary to determine what the difference is between lysergic acid diethylamide in its free base form and lysergic acid diethylamide in its salt form.

Expert testimony received in this case has established the following facts.

Lysergic acid diethylamide in the free base form is an organic compound which is characterized as a base. A base is a compound which is made up of molecules which have unshared electrons capable of forming bonds with molecules known as acids which are capable of accepting electrons. Bases and acids are thereby capable of chemically reacting with each other to form the combined state known as a salt. Thus, lysergic acid diethylamide in the free base form is chemically different from lysergic acid diethylamide in the salt form, in that the salt form represents a compound comprised of the base after it has combined with an acid. The resultant compound in the salt form has some differences in characteristics from those of the free base form.

An example of this difference is the higher melting point of the salt compound than that of the free base compound. Also, approximately ten percent of the molecular weight of the compound in its salt form is attributable to the addition of the acid molecule. Likewise, the physiological effects of equal amounts of lysergic acid diethylamide in the salt form and in the free base form differ by approximately ten percent, with the free base form having the greater hallucinogenic potential because of its greater concentration. It has also been proved that the salt form of the compound is more stable and less labile than the free base form.

Aside from the difference in chemical make-up and the aforementioned differences in characteristics, the free base form and the salt form are basically similar to each other. Both forms contain the intact lysergic acid diethylamide molecule. That is, even in the salt form, the lysergic acid diethylamide molecule retains its independent character and has a potential for ionizing or breaking up and returning to the free base state. Both forms are soluble compounds which chemically react similarly upon ingestion into the human body. Both have basi-

cally the same potential for hallucinogenic effect upon the human being.

## B. DEFINITIONS

The Court has heard experts testify about the technical definitions of "lysergic acid diethylamide," "LSD", and "LSD–25". The Court has also admitted into evidence various texts which purport to define this terminology. The Court concludes that the phrase "lysergic acid diethylamide" when used by and among chemists is a broad phrase which refers to a chemical compound which includes both the free base form and the salt form of lysergic acid diethylamide. The salt form is thought of even in the absence of specific reference to "lysergic acid diethylamide in the salt form," [5] since it is the more conveniently kept and more readily available form of lysergic acid diethylamide because of its greater stability and lesser lability. Thus, although a technical distinction between the two may sometimes be required for purposes of chemical use or analysis, the phrases "lysergic acid diethylamide," "LSD", and "LSD–25", in the absence of specificity or use in context which requires otherwise, refer to either or both the salt and the free base forms of lysergic acid diethylamide even when the phrase is used among chemists themselves.[6]

## C. THE STATUTE

■ In view of the insignificant differences between the salt form and the base form of lysergic acid diethylamide and the inclusive meaning which has attached to the phrases "lysergic acid diethylamide" and "LSD" in the eyes and ears of the public and chemists themselves, the Court concludes that due process of law has not been violated by allowing a conviction to stand upon this indictment which charges a conspiracy to

violate these federal statutes. The Constitution does not require that criminal statutes meet absolute standards of specificity. Instead, the test is "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Jordan v. De George, 341 U.S. 223, 231–232, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951). More particularly, the Court concludes that as to these defendants, the federal statute sufficiently proscribes the unlawful conduct they are charged with. The defendants have made no showing that they had technical knowledge of chemistry which prejudicially misled them into believing that the disposition of lysergic acid diethylamide in the salt form, as opposed to the base form, was lawful. See United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

## D. THE INDICTMENT

As to the indictment which basically follows the language of the statute, the Court concludes that it too is sufficient. See Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963). The test to be applied is (1) do the averments state the elements of the offense and apprise the defendants of what they must be prepared to meet; and (2) does the record clearly show the extent to which appellant may plead former acquittal or conviction. Heaton v. United States, 353 F.2d 288 (9th Cir. 1965). The indictment's use of the phrase "lysergic acid diethylamide" adequately gave notice to the defendants that they are being charged with a conspiracy to dispose of lysergic acid diethylamide or what is commonly known as "LSD" in either the salt or the free base form and sufficiently provides a record such that an acquittal or conviction on this indictment precludes further prosecution for conspiring to

---

5. For example, specific reference to various salt forms of lysergic acid diethylamide is accomplished by saying, "lysergic acid diethylamide tartrate," "lysergic acid diethylamide citrate," etc.

6. Lysergic acid diethylamide tartrate is the most common salt form available in laboratories and on the streets. Thus, "lysergic acid diethylamide" when used by chemists most often connotes "lysergic acid diethylamide tartrate."

dispose of lysergic acid diethylamide in the salt form or the free base form.[7]

Accordingly, it is hereby ordered that the defendants' motions for judgment of acquittal be and the same are hereby DENIED on the issues presented in what has been referred to by the Court and the parties as the "chemical portion of this case."

### APPENDIX A

The following are excerpts from the Senate Committee Report which recommended passage by the Senate of the amending bill. S.Rep.No.1609, 90th Cong., 2nd Sess. (1968), 3 U.S.Code Cong. and Adm.News, p. 4594 (1968).

"The Committee on Labor and Public Welfare, to which was referred the bill (H.R. 14096) to amend the Federal Food, Drug, and Cosmetic Act to increase the penalties for unlawful acts involving lysergic acid diethylamide (LSD)' and other depressant and stimulant drugs, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass." *Id.* at p. 4594.

### "HISTORY OF LEGISLATION

"In 1951, the Congress passed the Durham-Humphrey amendments to the Federal Food, Drug, and Cosmetic Act prohibiting the dispensing without a prescription by a licensed practitioner of drugs which require supervision by a practitioner of their use. At the time there was relatively little illicit

---

7. The defendants have called this Court's attention to 21 C.F.R. § 320.3 which designates the drugs found to have potential for abuse because of their hallucinogenic effect, in accordance with 21 U.S.C. §. 321(v). The drugs so designated are listed as follows:

" * * *

"(3) Hallucinogenic effect:

| "Established name | Some trade and other names |
| --- | --- |
| "Bufotenine and its salts. | 3-(B-Dimethylamino-ethyl) -5- hydroxy-indole; 3-(2-dimethylaminoethyl) -5-indolol; N, N - dimethyl-serotonin; 5 - hydroxy - N - dimethyltryptamine; mappine. |
| "DET and its salts | N, N - Diethyltryptamine. |
| "DMT | Dimethyltryptamine. |
| "DOM (STP) | 4 - Methyl - 2, 5 - dimethoxyamphetamine; 4 - methyl - 2, 5 - dimethoxy - a - methylphenethylamine and 'STP'. |
| "Ibogaine and its salts. | 7 - Ethyl - 6, 6a, 7, 8, 9, 10, 12, 13 - octahydro - 2 - methoxy - 6, 9 - methano - 5 H - pyrido (1', 2': 1, 2 azepino (4, 5 -b) indole: tabernanthe iboga. |
| "LSD - 25; LSD | d-Lysergic acid diethylamide." |

The defendants argue that use of the designation "and its salts" with other drugs listed with LSD-25, LSD indicates the significance of failure to include the designation "and its salts" with the listing of LSD-25; LSD. This contention lacks merit in that there is no showing that all of the differences, similarities, and meanings as discussed above with reference to lysergic acid diethylamide (or LSD-25; LSD) similarly exist with respect to the other drugs listed in 21 C.F.R. § 320.3. Furthermore, the contention is answered by the Supreme Court in Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932) where it is said:

"The true test of the sufficiency of an indictment *is not whether it could have been made more definite and certain,* but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'" [Emphasis added.]

traffic in barbiturates and amphetamines, and virtually no illicit use of hallucinogenic drugs subject to the Food and Drug Act.

"Subsequently, the abuse of amphetamines and of barbiturates increased, with widespread abuse of these drugs occurring among the young, who take amphetamines in order to pep themselves up, or barbiturates to slow themselves down. The illicit traffic in these drugs continued to expand to such an extent that the Commissioner of the Food and Drug Administration estimated that approximately one-half of the production nationwide in barbiturates and amphetamines was going into illegal channels. Beginning in the early 1960's, the unusual effects of LSD on the central nervous system began to attract the attention of many young people.

"In 1965, this committee reported legislation enacted as Public Law 89–74, known as the Drug Abuse Control Amendments of 1965, which provided for increased record keeping and inventory controls over barbiturates, amphetamines, and hallucinogenic drugs subject to the Food and Drug Act, in an attempt to curtail the diversion of these drugs to illicit channels.

"Widespread diversions are continuing, and although there appears to have been a decline recently in illegal use of LSD, the abuse of other hallucinogenic drugs appears to be increasing.

"The bill reported herewith is intended to curb this illicit traffic, through providing increased penalties for trafficking in these drugs, and by providing, as a tool to aid in the enforcement of the prohibitions against trafficking, penalties for illicit possession of drugs subject to the act." *Id.* at pp. 4594–95.

## "THE HALLUCINOGENS

"Hallucinogenic, or psychedelic, drugs and the controversy that surrounds them have recently arroused the attention of the mass media and the public.

This is certainly due in part to the increasing incidence of their use on college campuses. It may also be due to the emergence of new substances, such as LSD, many times more potent than such older hallucinogens as peyote and mescaline. All these drugs have the capacity to produce altered states of consciousness. Generally they are taken orally.

"LSD, the most potent of the hallucinogens, is a synthetic drug made by a chemical process; lysergic acid is the main component in the chemical conversion. Minute amounts of the drug are capable of producing extreme effects. It is usually deposited on sugar cubes in liquid form, although recently it has been found frequently in pill form. Swallowing such a cube or pill is called taking a trip.

"The only legal producer of LSD ceased manufacture in April 1966, and turned over its entire supply of the drug to the Federal Government. A few closely monitored experimental projects involving LSD are still in progress." *Id.* at pp. 4596–97.

## "SECTION-BY-SECTION SUMMARY OF THE COMMITTEE AMENDMENTS

*"Specific inclusion of LSD in definition of term 'depressant or stimulant drug'.*

"The first section amends section 201 (v) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 321] for the purpose of specifically including lysergic acid diethylamide (LSD) in the definition of the term 'depressant or stimulant drug.' Under subparagraph (3) of that section LSD has been included in that definition as a drug which has been found to have, and is designated as having, a potential for abuse because of its hallucinogenic effect. Under the amendment no such finding and designation will be required to include LSD in the definition." *Id.* at 4602.

The following is the introductory paragraph to Conference Rep.No.1958, 90th

Cong., 2nd Sess. (1968), 3 U.S.Code Cong. and Adm.News, p. 4604 (1968):

### "STATEMENT OF THE MANAGERS ON THE PART OF THE HOUSE

"The managers on the part of the House to the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 14096) to amend the Federal Food, Drug, and Cosmetic Act to increase the penalties for unlawful acts involving lysergic acid diethylamide (LSD) and other depressant and stimulant drugs, and for other purposes, submit the following statement in explanation of the effect of the action agreed upon by the conferees and recommended in the accompanying conference report: * * *."

Examples of other pertinent comments by individual Congressmen are as follows:

"The hallucinogens vary in their chemical makeup, but the most widely known is LSD, lysergic acid diethylamide. Others include peyote, Mescaline, and Psilocybin.

"By this bill, LSD is specifically included in section 201(v) (3) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321) as well as any other drug which contains any quantity of a substance which now the Attorney General of the United States after investigating has found to have, and by regulation designates as having, a potential for abuse because of its hallucinogenic effect." 114 Cong.Rec. H6475 (daily ed. July 12, 1968) (remarks of Congressman Rogers on floor of the House of Representatives).

"Mr. Speaker, I rise in support of the bill, H.R. 14096, to prescribe penalites for the possession of LSD and other hallucinogenic drugs by unauthorized persons.

"It has been 5,000 years since Chinese physicians prescribed marijuana to induce euphoria and to reduce pain. Since then many other drugs have been discovered and used for medical purposes. These drugs, vital to pre-scientific medicine, were abused almost as rapidly as they were discovered, and when the age of chemistry discovered new synthetic drugs, the abuse stayed abreast of the new discoveries.

"The new drugs, however, did more than relieve pain; they also changed the behavior of the user. The most powerful of these new drugs is LSD, d-lysergic acid diethylamide. This drug like many others, has a legitimate scientific use; it is used in the experimental study of mental functions and as a treatment for alcoholism. But it also causes hallucinations often lasting for hours, and is taken by many people for 'kicks.' These 'kicks,' unfortunately, are often accompanied by distortion of perception, panic, violent impulses, suicidal acts, and insanity. Recent evidence indicates it may adversely affect the human chromosome and cause birth defects in the children of LSD users.

"The illegal use of LSD and other drugs is a serious and growing problem in this Nation today. More and more of our young people are 'turning on' and 'dropping out' ostensibly because they are alienated from our society or just out for 'kicks'.

"LSD may provide the user with 'kicks', but it can also do permanent damage to the brain. An increasing number of our young people, their brains irreparably damaged by LSD, are winding up in mental hospitals, some of them never to come out.

"Part of the answer to this problem is education, based on increased research, so that potential drug users will know and understand the real price of getting their 'kicks' from LSD. In addition, there is a need for more educational efforts to be made at the community level, in schools, churches, and other community organizations—and, most of all, in the family.

"Research and education will accomplish only part of the task, however.

The illegal use of drugs provides fertile ground for the extension of organized crime. The remedy for this part of the drug problem lies in strengthening our drug laws. The bill being considered today will do just that, by prohibiting the illegal manufacture, sale, possession, and use of LSD and other similar drugs.

"The illegal use of LSD is growing, and estimates of the number who use it today are staggering; there is a critical need for this legislation and I urge my colleagues to give it their support today."

114 Cong.Rec. H6481 (daily ed. July 12, 1968) (remarks of Congressman Murphy on floor of the House of Representatives.)